### DAILY v. NEW YORK HERALD CO.

(Circuit Court, S. D. New York. March 2, 1907.)

1. LIBEL—ACTIONABLE PUBLICATION—CONSTRUCTION OF LANGUAGE USED.

In determining whether a publication is libelous per se, it must be read and considered as a whole.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Libel and Slander, § 99.]

2. SAME—ACTIONS—PLEADING.

> If a published article, declared on as a libel, is susceptible of two constructions, one libelous and the other not, there must be an innuendo ascribing to it the libelous meaning.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Libel and Slander, §§ 205, 206.]

3. SAME—CONSTRUCTION OF LANGUAGE USED.

> In determining whether or not a publication is libelous per se, the language used is to be given its ordinary import and meaning.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Libel and Slander, § 98.]

4. SAME—LANGUAGE CONSTRUED.

> A newspaper article construed, and held not to charge plaintiff with any act or conduct which rendered it libelous per se, or would sustain a verdict in his favor for damages, in the absence of any innuendo or allegation of special damages.

At Law. Motion to set aside verdict for plaintiff and for a new trial on the grounds: (1) There is nothing libelous on the face of the published article; that is, all the statements, if capable of a libelous meaning, are also capable of an innocent or nonlibelous meaning, and, as there is no innuendo ascribing the libelous meaning, no cause of action is stated. (2) It was error to submit certain parts of the alleged libelous article to the jury. (3) In any event the damages are excessive.

Edward G. Peters, for plaintiff.

Jay & Candler, for defendant.

RAY, District Judge. There is nothing libelous on the face of the published article unless it be in the following language:

"It was stated yesterday that after leaving San Francisco Mr. Daily went to New York and organized a smelter company, his associates understanding that the Bulls Point smelter was his property. They sent a man here, who quickly discovered that Daily had no title to the smelting works. The New York men, it is asserted, demanded the return of their money and threatened prosecution, whereupon Mr. Daily brought the local suit as evidence of his good faith."

The crucial question is, does this charge that the plaintiff, Daily (there is no dispute it refers to him), in organizing the smelter company, put the Bulls Point property into the company on the representation it was his property, and so either obtained money from his associates or induced them to put money into the company, or that, merely representing the property to be his when it was not, he thereby induced his associates to part with their money, either to him or to the company, as such, so that it became the money of such company? Does it necessarily charge Daily with crime, or with bad or dishonest conduct such as would bring him into disgrace and contempt among his fellows? There is no direct statement that Daily made any representation as to the ownership of the property, or that he obtained any money of any one, or that he induced any one to part with any money. It does charge that Daily organized a smelter company and that his associates in the formation of that company understood from some source, or some person, possibly, that Daily owned the Bulls Point smelter property. It then says, in substance, that on investigation these associates in the

company formed in New York found that Daily did not own the Bulls Point property, which they understood from some source Daily owned; that thereupon they demanded a return of their money from some one, not necessarily Daily, and threatened some one, not necessarily Daily, with prosecution, "whereupon Mr. Daily brought the local suit as evidence of his good faith." This plainly means "evidence of his good faith" in something he had done or in taking some action he had taken, and, in connection with what goes before, must be understood to mean good faith in representing to his associates or some one in some way that the Bulls Point property was his. While they may not have paid money to or for him, the charge is, plainly, they had paid money or parted with money because of knowledge of these representations and had threatened some one with prosecution; not necessarily, I think, the one who had made the representations. Hence the charge necessarily is, and would be so read and understood, that Daily had represented to some one, and that this representation had been communicated to his associates in the company, that he owned the property, when he did not have title, and thereby such associates had been induced to part with their money, and on learning the truth had threatened some one with prosecution, whereupon he (Daily), as evidence of his good faith—that is, honesty—in making the representations, had brought suit, as described in a previous part of the article, to recover the property.

Is there the plain intendment, or, at least, insinuation, that such action was brought as evidence of good faith, honesty, and integrity in making the representations to avoid prosecution, and not because of or relying on the justice of the claim, or in the belief he was in fact the owner of the Bulls Point property? There is no charge that Daily intended to deceive, or defraud, or mislead, or that he made the representations for the purpose, or with the intent, of inducing his associates, or any one, to part with money or property. It is merely a charge (1) that he did procure the formation of a company; (2) that he did represent to some one that he owned the property mentioned; (3) that such statements came to the knowledge of his associates; (4) that they then parted with their money to some one; (5) that, on learning Daily had no title, they threatened prosecution; and (6) that thereupon and because thereof Daily brought suit to show or demonstrate his honesty or good faith. As there is no statement that Daily falsely or knowingly, or with bad intent, made the representations, it may be there is no charge of bad or dishonest conduct in what has been quoted; but the article did not stop there. It proceeds:

"In this suit Mr. Daily charged that the property stood in his name, and that the documentary proofs of the claim had been stolen from the office of Frank Deering, who was his attorney, during his management of the Copper King Mine. Mr. Deering denies this, and asserts that he has in his possession a will executed by Mr. Daily just before he left the Copper King Company's employ, in which Mr. Daily sets forth that he holds no interest whatever in the corporation."

This presents, in connection with the prior statement, the claim of Mr. Daily to the smelter property and the basis of his suit for its recovery. It presents a contention made by Mr. Daily that he had title,

and a contention of his former attorney, Mr. Deering, that he had declared in a written instrument, not that he had no interest in the Bulls Point smelter, but no interest in the corporation, and states that Deering denies the documentary proofs of Daily's title to the property had been stolen from his office. But the article must be taken as a whole in ascertaining what charge is in fact made, and so we go back to some prior statements. The article says in substance, that the Copper King Mining Company, Limited, had been previously organized, designated in the article as the "Gardner Concern"; that W. H. Daily appeared as its manager, and that finally a big smelter was erected at Bulls Point, which had proved a failure. This is the coporation and this the smelter hereinbefore referred to as "the company," in which Deering claimed Daily had no interest, and the smelter works of which it was claimed or said he had no title. As to Daily's claim and the bringing of the suit the article says, prior to the part first quoted:

"Daily came westward as far as Sacramento, and directed that a suit be brought in the United States court here against the company, the property of which he laid claim to, and out of which he declared he had been defrauded by Frank Gardner's agents through connivance with persons here."

The publication of the article complained of grew out of the failure of this Copper King Mining Company and the article purports to give a sort of history of certain matters or transactions, both in and out of court, connected with its formation, conduct of business, financial embarrassments, etc., and claims made in regard thereto, and in so doing makes the statement quoted in regard to Mr. Daily the one-time manager of the company.

I think that, as a whole, the article as published is self-explanatory, and fails to charge Mr. Daily with either bad, dishonest, or criminal conduct or impute same to him. It gives the respective claims, but makes no charges or statements not explained, and in the main it relates to proceedings in court and matters of general interest. The article published, as a whole, may be susceptible of two constructions, one libelous and the other not; but the complaint contains no innuendo ascribing to it, or to any part of it, the libelous meaning. In such cases it is held that there must be an innuendo ascribing to the article the libelous meaning. Beecher v. Press Publishing Co., 60 App. Div. (N. Y.) 536, 69 N. Y. Supp. 895; Outcault v. New York Herald Co. (App. Div., 1st Dept., Dec., 1906) 102 N. Y. Supp. 685, per Clarke, J., not yet officially reported; Kingsbury v. Bradstreet Co., 116 N. Y. 211, 22 N. E. 365; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440; Crashley v. Press Publishing Co., 179 N. Y. 27, 34, 71 N. E. 258. This is the rule laid down in Beecher v. Press Publishing Co., and Outcault v. New York Herald Co., supra, actions for libel. It should be stated, however, that Hemmens v. Nelson, relied on in Beecher v. Press Pub. Co., was an action for slander, and in Kingsbury v. Bradstreet Co., an action for libel, the court held that the words and circular complained of, standing by themselves, were "incapable of a defamatory meaning," and in Crashley v. Press Publishing Co., at page 34 of 179 N. Y., page 260 of 71 N. E., the court said:

"But it is argued that the words in the article, describing the plaintiff as 'an Englishman of more or less indifferent repute,' were libelous per se. If the complaint had alleged the libelous meaning by innuendo, to wit, that the words meant that the plaintiff's reputation or character was bad that would have been so. As a mere statement, however, without innuendo, the language signifies nothing, except that the person spoken of had no particular 'repute,' one way or the other, or that he had but an ordinary reputation, or that he was too obscure to have gained any repute. Many persons, possessing excellent characteristics, might find themselves in that category."

But, if that is the rule in actions of slander, I do not see why it should not be the rule in actions for libel. It is true that words which are not actionable when spoken may be so when written or published; but, if capable of two meanings, one slanderous or libelous and the other not, I cannot see why an innuendo is more necessary in the one case than in the other. I do not think that in actions of this character there is any presumption that the writer or publisher of such words uses them in a defamatory sense, but rather the contrary, when they stand alone, and that, if the publisher is to be put to proof that they were not used in a defamatory or injurious sense, he should be charged in the complaint with having so used or published them, and that there should be legal proof of the fact. Here there is no allegation that defendant intended to charge Daily with having knowingly and willfully represented that he owned or had title to the property in question when he did not, or that he made such representations even, or that he made them, if he did, with any wrongful or fraudulent intent, or for any fraudulent purpose, or to procure or induce any person to part with money, or that he brought his local suit to prevent or avoid prosecution, etc. It is true, I think, that the published words are capable of that construction by addition of words and sentences, by reading something between the lines, but not otherwise. Such was the case in Crashley v. Press Publishing Co., supra. He was "an Englishman of more or less indifferent repute," were the published words, and these were, said the court, susceptible of the meaning that he was a man of bad character. That meaning was not, however, attributed to the words by innuendo, and hence neither court nor jury could give them that meaning.

In Beecher v. Press Association, supra, the words were:

"Dr. Meredith lives at 97 McDonough street, only a short distance from Dr. Beecher's house.

"Within ten minutes of the receipt of this alarming message the kindly pastor of Tompkins Avenue Congregational Church was with his old friend.

"Dr. Beecher then explained that his son Eugene had obtained possession of certain valuable securities belonging to him and had refused to return them.

"Investigation revealed the fact that Dr. Beecher had fallen heir to considerable property, including the Macon Street house, on the death of a relative.

"Eugene Returned Securities.

"Dr. Meredith handled Eugene Beecher without gloves. In a letter to the young man, Dr. Meredith gave him a choice of alternatives in words like these:

"'Return those securities to your father within twenty-four hours or get out of Brooklyn. You can't keep them and continue to live in this city where your family has held an honorable and distinguished position.'

"The securities were returned. They were all turned over to S. V. White, who handled them to the best advantage for Dr. Edward Beecher, releasing the faithful coterie from further donations."

The words there, regarding Beecher, were susceptible of a construction, by reading between the lines only, of a meaning charging larceny or wrongful or fraudulent conduct.

In Hughes v. New York Evening Post Co., 115 App. Div. 611, 613, 100 N. Y. Supp. 982, the words were:

"Mr. Hughes' story is that he was thrown into jail by Magistrate Pool without a chance to tell his side of the case, on the complaint of a woman for whom he had collected a debt, and from which amount of money collected he had deducted the legal percentage for collection."

There, by reading between the lines, it might be read as a statement that Hughes had been thrown into jail because he had unjustly and fraudulently retained money he was not entitled to and had committed even larceny. *Held* not libelous per se. Many other cases of like import might be cited, but I think it unnecessary.

I do not read Morrison v. Smith, 177 N. Y. 366, 368, 369, 69 N. E. 725, as conflicting with these views. True, Judge Gray, in referring to innuendoes, says:

"If the language is unambiguous, whether it is actionable becomes a question of law; but if ambiguous and capable of an innocent, as well as of a disgraceful meaning, the question becomes one for the jury to settle. When the defamatory meaning is not apparent, innuendo is necessary. If the words are incapable of the meaning ascribed to them by the innuendo, and are, prima facie, not actionable, the complaint should be dismissed. If they are capable of such a meaning, however improbable it may appear, the jury should say whether they may be so understood. Odgers' Libel and Slander, 107; Sanderson v. Caldwell, 45 N. Y. 398, 6 Am. Rep. 105."

He was not attempting to state the rule with accuracy, but only in a general way applicable to that case, and he does not mean to say or intimate that an innuendo is not necessary in an action for libel, where a charge of criminal or bad conduct may be attributed to the publication complained of by reading something between the lines only; that is, when there are two meanings that may be given, one not libelous and the other libelous, the latter by some addition, however, reading in something that may be understood, but not necessarily. The only question decided by the court in that case was that, when a printed publication is libelous on its face, per se, no innuendo is necessary; and if in such a case the pleader by an innuendo ascribes to the words a meaning which neither they themselves, nor the proof, nor both together, support or justify, still the case is made out, and if the publication is not justified it becomes simply a question of damages. I do not doubt the soundness of that holding. The innuendo in such a case may be regarded and treated as surplusage, as, indeed, it is.

Another rule must be remembered and applied in this case, or, rather, an exception to the general rule, and that is stated in Hayes v. Ball, 72 N. Y., at page 420, viz.:

"The rule is that the language employed is to be given its ordinary import and meaning, unless an explanation accompanies the use of the words which gives them a different meaning, or unless all the hearers understand that they refer to a transaction which cannot constitute the crime which the words

imply. Philips v. Barber, 7 Wend. (N. Y.) 439; Mayor of N. Y. v. Lord, 17 Wend. (N. Y.) 296; Van Akin v. Caler, 48 Barb. (N. Y.) 58; Maybee v. Fisk, 42 Barb. (N. Y.) 326."

The complaint in this case does not allege that plaintiff has any business or occupation, or that the words were published of or concerning him in any business or occupation. It does not charge that he has sustained any special damage or allege any. Therefore, not being libelous per se, there was no question for the jury.

The verdict of the jury must be set aside, and a new trial granted.